FILED
IN OPEN COURT

JAN - 8 2025

CLERK, U.S. DISTRICT COURT
NORFOLK, VA

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| v. ) | |
| ) | |
| MICHAEL HENRY, ) | CRIMINAL NO. 2:24-cr-111 |
| ) | |
| Defendant. ) | |

## STATEMENT OF FACTS

By signing below, the parties stipulate that the allegations in the Indictment and the following facts are true and correct, and that had the matter gone to trial the United States would have proven them beyond a reasonable doubt, by competent and admissible evidence.

Background Information

Unless otherwise stated, at all times relevant:

1. Defendant MICHAEL HENRY ("HENRY" or "defendant") was the Joint Staff J6 Joint Tactical Integration Element (JSJ6) research analyst from on or about January 2015 to April 2023. In his position at the JSJ6, HENRY provided technical director and subject matter expertise. As part of his position, he identified and demonstrated systems and best practices across DoD, to include Special Operations Forces, and then facilitated the migration of those best practices/systems to the conventional or general-purpose forces. His position was not limited to advising government personnel, he also advised vendors on what equipment was needed, how best to integrate the equipment, and the number of pieces of equipment required to meet the operational requirements. His duties included picking between competing equipment/vendors that could be used to satisfy the general-purpose forces need, including making

1

recommendations to Senior Service Headquarters, Service Program Executive Officers, Unit Commanders, and others. As part of his duties, HENRY also provided advice, consultations, and demonstration of capabilities, to include information on vendor-supplied equipment. As a U.S. Government employee, HENRY was classified as a "public official" as defined within 18 U.S.C. § 201(a)(1). His duties as a research analyst put him in a position to evaluate products, demonstrate them, and make recommendations to other U.S. Government officials on what products to purchase, i.e. award contracts.

2. The JSJ6 Joint Tactical Integration Element is located in Suffolk, Virginia. Suffolk, Virginia is within the Eastern District of Virginia.

3. Company A is a DoD contractor that sells a software called TRAX. TRAX is short for Tactical Radio Application eXtension. It is software that hosts, translates, and routes mission-critical data to and from disparate networks. It gives military personnel the ability to share data across platforms and branches of service.

4. As part of his job with JSJ6, HENRY promoted and recommended TRAX to U.S. Government offices and personnel.

<u>Industrial Communications Group LLC (hereinafter "ICG").</u>

5. On November 13, 2018, HENRY incorporated Industrial Communications Group LLC ("ICG") while still employed with JSJ6.

6. The company's office address was the same as HENRY's Virginia Beach, Virginia residence.

7. Virginia Beach is within the Eastern District of Virginia.



8. Further documentation from HENRY's bank account, business records, and emails confirmed he initially had three partners in ICG. All of his business partners were employed by Department of Defense (DoD) contractors at the time ICG was formed.

9. One of these business partners was an employee of Company A.

10. In an email dated February 5, 2020, HENRY told his business partners, "As discussed, to keep clean and avoid any perception of impropriety, its just me on ICG legal paperwork as of today. We can add you back on once I leave govt or any of you leave your respective companies or the timing is right."

11. A month later, HENRY emailed his business partners a Navy Federal Credit Union (NFCU) form to remove them the ICG business account. In the email he noted he did this "so no connection."

12. On December 7, 2018, HENRY submitted a request to his command for approval of outside employment on a part time basis with ICG. He stated his duties would involve providing communication consultation with the "oil and gas industry" within the "United States and South America."

13. The request for approval of outside employment was approved by his supervisor on December 20, 2018. At the time of the approval, HENRY's supervisor was unaware that HENRY was the owner/founder of ICG or that he would be paid by Company A for his consulting work at the same time he was working for JSJ6.

### HENRY's Relationship with Company A

14. Prior to becoming a paid consultant with Company A, HENRY gave presentations on TRAX within the DoD and demonstrated the product at military exercises. In his 2018

3

performance review, it was noted that he provided senior leader briefs for TRAX within the Special Operations Command (SOCOM) community.

15. In his job with JSJ6, HENRY was instrumental in facilitating contracts/purchase orders for TRAX with the general-purpose forces and special forces.

16. HENRY conducted weekly calls with all vendors to include Company A on the status of planned acquisitions, guidance on how to best meet the needs of the general-purpose forces, and to obtain cost estimates for those services.

### HENRY's Employment with Company A

17. HENRY began speaking with Company A about becoming a paid consultant of Company A in and around May 2019.

18. In or about July 2019, Company A hired HENRY as a consultant.

19. As part of Company A's hiring process, HENRY submitted the previously obtained approval for outside employment that he obtained from his government supervisor allowing for consultation with the "oil and gas industry."

20. HENRY knew this approval for outside employment did not authorize his consultation employment at Company A.

21. HENRY obtained this prior approval for outside employment in December 2018 prior to any negotiation of employment with Company A.

22. As part of his consultant agreement with Company A, HENRY certified that he was aware of and "familiar with and will continue to be familiar with the current laws regarding conflict of interest and the limitations on activities of former government officials. Consultant will not perform nor engage in any activity which violates these laws."

4

23. After becoming a consultant for Company A, no firewalls were put in place to prevent any conflict of interest between HENRY and Company A.

24. Between in or about July 2019 to in or about July 2020, HENRY consulted for Company A. HENRY received payment from Company A through ICG from in or about September 2019 through in or about July 2020, totaling approximately $96,336. These payments occurred on or about the dates and in the amounts listed below:

| Date | Amount |
| --- | --- |
| September 5, 2019 | $5,000.00 |
| September 30, 2019 | $5,000.00 |
| November 5, 2019 | $5,000.00 |
| December 3, 2019 | $5,000.00 |
| January 6, 2020 | $12,544.25 |
| February 27, 2020 | $10,750.00 |
| March 19, 2020 | $7,976.62 |
| March 31, 2020 | $7,500.00 |
| April 7, 2020 | $4,309.62 |
| April 13, 2020 | $1,549.30 |
| April 14, 2020 | $7,500.00 |
| June 2, 2020 | $7,500.00 |
| June 30, 2020 | $7,708.99 |
| July 9, 2020 | $1,527.93 |
| July 30, 2020 | $7,500.00 |

Case 2:24-cr-00111-RAJ-LRL Document 22 Filed 01/08/25 Page 6 of 10 PageID# 58

25. Following the execution of the consulting agreement, HENRY communicated to individuals at Company A that he had an idea for a new cross domain solution later called "Armored Scorpion" that combined a product from Company A with a product from Company B that needed a government sponsor to receive a certification from the National Security Administration. Government sponsors are required to obtain that certification.

26. Following this proposal, HENRY coordinated meetings with government officials to find a government sponsor for Armored Scorpion as part of his job with JSJ6. HENRY billed Company A for these meetings.

27. HENRY also assisted Company A in obtaining testing certifications for Armored Scorpion and demonstrating Armored Scorpion at a military exercise as part of his job with JSJ6.

28. HENRY also recommended that the U.S. Army purchase Armored Scorpion as part of his job with JSJ6.

29. HENRY also presented Armored Scorpion to other government officials to advocate for Armored Scorpion, to assist in testing it, and to assist in asking the National Security Administration to certify it as part of his job with JSJ6.

30. In his consultant reports to Company A from on or about July 2019 to on or about May 2020, HENRY referenced this work on "Armored Scorpion."

31. HENRY and Company A also coordinated and pursued Company A obtaining a 5-year sole source indefinite delivery indefinite quantity ("IDIQ") contract with the General Services Administration ("GSA") (hereinafter referred to as the "GSA IDIQ"). This contract had a ceiling of $354 million dollars. HENRY's command, the JSJ6, sponsored the IDIQ contract with the GSA.

6

32. As part of that sponsorship, the GSA relied on the JSJ6 to provide technical expertise and drafting and routing approval memorandums to award the IDIQ contract.

33. The IDIQ contract could not have been awarded without the approval of JSJ6, which included work done by the defendant on behalf of JSJ6.

34. On December 4, 2019, an employee of Company A emailed an employee at GSA regarding a source of funding for the IDIQ contract. HENRY was included on the email.

35. During the procurement process of the GSA IDIQ contract and while consulting for Company A, HENRY rendered advice to government employees involved in the procurement process.

36. Both prior to and during his consultancy with Company A, the JSJ6 facilitated the certification of TRAX. Without this certification entities within the DoD could not use the product. HENRY was integral and involved in this process in his official capacity with JSJ6.

37. HENRY's efforts related to "Armored Scorpion," the certification of TRAX, and the GSA IDIQ were matters before the executive branch of the United States that he participated in through decision, recommendation, the rendering of advice, and otherwise.

### Termination of his Consultancy with Company A

38. Around February 2020, while employed at JSJ6, HENRY offered the CEO of Company B his consulting services in the commercial marketplace. During the conversation, HENRY stated that he was already consulting with Company A and that he had prior approval from the government to do so.

39. A few weeks later, HENRY had another conversation the CEO of Company B. During the conversation, the CEO of Company B asked to see HENRY's contract with Company A. The CEO of Company B informed HENRY of his concerns regarding a potential conflict of

7

interest and told HENRY that he should not be engaged in this business. The CEO of Company B then told HENRY that his consulting was inappropriate, HENRY should report this to his superiors, or the CEO of Company B would report it.

40. HENRY never reported his consultancy with Company A to his supervisor at JSJ6.

41. In June 2020, Company B disclosed to HENRY's supervisor his conflict of interest with Company A.

42. Later that month, HENRY terminated his consultancy with Company A.

43. In September 2020, HENRY's supervisor revoked his approval for outside employment and directed HENRY to cease all outside business activities.

44. In February 2021, while still working at JSJ6, HENRY began outside business activities with Company C without outside approval. This unauthorized work continued until approximately the beginning 2022.

45. The parties agree that the government could prove beyond a reasonable doubt that from in or about July 2019, to in or about July 2020, in the Eastern District of Virginia, and elsewhere, the defendant, MICHAEL HENRY, being an employee of the DoD that served as the technical director of the JSJ6 Tactical Integration Element, knowingly and willfully did participate personally and substantially as a government officer and employee through decision, approval, recommendation, the rendering of advice, investigation, and otherwise, in an application, contract, claim, and other matters, in which the defendant had a financial interest.

46. This statement of facts includes those facts necessary to support the plea agreement between the defendant and the United States. It does not include every fact known to the defendant or to the United States, and it is not intended to be a full enumeration of all of the facts surrounding the defendant's case.

47. The actions of the defendant, as recounted above, were in all respects knowing, deliberate, and intentional, and were not committed by mistake, accident, or other innocent reason.

Respectfully submitted,

Jessica D. Aber
United States Attorney

By: _____
Matthew J. Heck
Assistant United States Attorney

After consulting with my attorney, I hereby stipulate that the above statement of facts is true and accurate, and that had the matter gone to trial, United States would have proved the same beyond a reasonable doubt.

_____
Michael Henry
Defendant

I am the attorney for Michael Henry, I have carefully reviewed the above statement of facts with the defendant. To my knowledge, the defendant's decision to stipulate to these facts is informed and a voluntary one.

_____
Dane Ball, Esq
Counsel for Defendant

_____
Andrew Bosse
Counsel for the Defendant