IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

*Norfolk Division*

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Case No. 2:24-cr-111 |
| | ) | |
| MICHAEL HENRY, | ) | |
| | ) | |
| Defendant. | ) | |

### DEFENDANT MICHAEL HENRY'S SENTENCING MEMORANDUM

Defendant Michael Henry, by counsel, respectfully submits this sentencing memorandum and requests, in accordance with his Rule 11(c)(1)(B) plea agreement, that the sentence imposed be in the form of probation or a reasonable fine rather than a period of incarceration. For the reasons below, such a sentence would be sufficient but not greater than necessary to achieve the statutory purposes of 18 U.S.C. § 3553.

Mr. Henry has no objections to the Presentence Investigation Report ("PSR") and agrees with its calculation of a guidelines range of 0–6 months and a fine in the range of $200 to $9,500. PSR ¶¶ 60–61.

\*            \*            \*

Michael Henry is a true-life hero who devoted his career to serving the United States. He spent much of his adult life deploying to Iraq, Afghanistan, and other combat theaters as an Army Special Forces officer, under fire, on missions of national importance. He received five Bronze Stars for valor. Although his service resulted in post-traumatic stress disorder and traumatic brain injury, in 2018 he successfully transitioned to a civilian role in the J6 Directorate of the Joint Chiefs of Staff.

1

As Michael has acknowledged, in 2019, during a period of serious turmoil in his personal life, he made a significant error in judgment by violating the ethical restrictions on outside employment by a federal employee. As a result, he will now be a convicted felon, with all of the limitations and opprobrium that a federal felony conviction carries. Among other things, his conviction, and the Notice of Proposed Debarment he received last week from the U.S. General Services Administration as a result of his guilty plea, will dramatically affect the scope of his work for the rest of his career.

As the prosecution will acknowledge, Michael's ethical lapse did not harm either the government or the company he consulted for—which should never have allowed this arrangement to be put in place, and which, unlike Michael, will suffer no consequences for its own errors in judgment. None of that undoes the crime he has taken responsibility for: 18 U.S.C. § 208(a) is an important prophylactic meant to protect against potentially dangerous conflicts of interest, and so it is the conflict itself that is the violation. While Michael did receive authorization to pursue outside employment, that authorization did not cover what happened here, and he knows he should not have entered a consulting arrangement with a company he interacted with in his role at the Department of Defense. The fact that he did not intend or cause harm is irrelevant to his legal guilt, but the Court should consider that fact, along with the other facts and circumstances set out below, in fashioning a fair and just sentence.

The PSR is typically the key document in determining what that sentence should be. Here, though, the Court should begin with the letters in support of Michael from his elderly parents, his sister, and the many other men and women he served with, befriended, and helped during and after

his active duty service.[1] Along with the PSR's description of that service (¶¶ 52–56), the letters present a full picture of who Michael is and show why the parties have agreed to jointly recommend against incarceration. Michael's military record, the aid he has provided to his fellow veterans, and his family's reliance on his support all weigh strongly in favor of a sentence to a limited period of probation that will allow him to continue working and providing the in-person care his parents need. Last, the government's request of a fine that is many multiples of the high end of the guidelines range is inappropriate on these facts. Any fine levied purely as punishment should be reasonably tailored to the seriousness of the violation. As shown below, fines in § 208(a) cases are typically dramatically lower than what the government requests here, even in cases that involved more significant wrongdoing. The Court should decline to impose a fine that is more than 2500% of the top end of the guidelines range.

## PROCEDURAL BACKGROUND

On September 26, 2024, Michael Henry was charged in a single-count indictment with Acts Affecting a Personal Financial Interest, in violation of 18 U.S.C. § 208(a).[2] The indictment was unsealed on November 7, and he made his initial appearance on November 25. ECF Nos. 8, 17. Less than one month later, the Court set a change of plea hearing, and Mr. Henry pleaded guilty on January 8, 2025. ECF No. 20. As noted, the plea agreement he and the government reached pursuant to Federal Rule of Criminal Procedure 11(c)(1)(B) stipulated that the government would make a non-binding recommendation that Mr. Henry not be incarcerated. ECF No. 21 ¶ 5. He has

---

[1]     Thirteen letters in support, redacted to remove personal identifying information, are filed as Exhibit A to this memorandum.

[2]     As the government will acknowledge, the reference to forfeiture in the indictment was added incorrectly. Forfeiture is not applicable here.

been on pre-trial release since his appearance, with no domestic travel restrictions, and has fully complied with the Court's conditions of release. *See* ECF No. 25.

Mr. Henry's sentencing hearing is scheduled for Thursday, May 8, 2025.

## DISCUSSION AND ANALYSIS

### I.    The Statutory Sentencing Framework

In imposing its sentence, the Court must first correctly calculate the applicable guidelines range. *Peugh v. United States*, 569 U.S. 530, 536 (2013). Here, there is no dispute about that range. Then, although "the Guidelines should be the starting point and the initial benchmark," the Court "must … consider the arguments of the parties and the factors set forth in § 3553(a)." *Id.* Courts "may not presume that the Guidelines range is reasonable," *id.*, and "must make an individualized assessment based on the facts presented," *Gall v. United States*, 552 U.S. 38, 50 (2007).

Thus, although sentencing courts must continue to consider the Guidelines, Congress has required federal courts to impose the least amount of imprisonment necessary to accomplish the purposes of § 3553(a). In passing judgment, "[i]t has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and punishment to ensue." *Koon v. United States*, 518 U.S. 81, 113 (1996).

Here, because the applicable guidelines range of 0–6 months is within Zone A of the Sentencing Table, Mr. Henry is eligible for a sentence of probation. *See* U.S.S.G. § 5B1.1(a). Because his offense level (2) is less than 6, the maximum probation term under the guidelines is three years. U.S.S.G. § 5B1.2(a)(2). The statutory maximum fine is $250,000, and the guidelines fine as calculated under the Fine Table at U.S.S.G. § 5E1.2(c)(3) is $200–$9,500.

II.    **Application of the Sentencing Factors**

**A. The Nature and Circumstances of the Offense**

The nature and circumstances of the offense are accurately set forth in the Statement of Facts, ECF No. 22, and the "Offense Conduct" conduct section of the PSR.

In 2018, Michael retired from his uniformed Army service as a Colonel and began work as a civilian at the Joint Staff J6 Joint Tactical Integration Element, based on Suffolk, Virginia. PSR ¶ 7-1. In layman's terms, he was a battlefield communications specialist. While on active duty, he helped develop the communications architecture used to de-conflict and coordinate the numerous streams of signals data that pour in during complex military operations involving sea, air, and land-based operations. That task is especially important in special forces missions, which often involve operators from multiple service branches using different communications platforms. The job is eye-wateringly complex, and Michael was (and is) very good at it; his innovative work on battlefield communication systems has almost certainly saved the lives of many U.S. servicemen. When he transitioned to the civilian side, his work involved helping other U.S. military units employ the kinds of communications solutions developed for special forces groups. *See id.* That worked necessarily involved interacting with communications equipment and software vendors, including Company A. *Id.*

While at JSJ6, Michael incorporated a consulting entity, which initially included other partners whom he later removed to avoid any perception of impropriety. PSR ¶¶ 7-5 to 7-11. He then secured command authorization to do outside communications consulting while still

employed as a government civilian, specifically for the oil and gas industry.[3] PSR ¶¶ 7-12 to 7-13.

At this point, Michael made the crucial error in judgment that led to a multi-year investigation and this indictment: he entered a consulting agreement with Company A, whose main communications product he dealt with in his role as a government employee. While he did perform consulting work on oil-and-gas industry applications for Company A's product, the lines inevitably became blurred, in part because he worked with several of the same individuals at Company A as a consultant and in his role at JSJ6, all in relation to the same communications technology product. *See* PSR ¶¶ 7-16, 7-36–37. Notably, Company A—which hired Michael knowing that he was a civilian government employee but did not affirmatively wall off his consulting work from his government work—has suffered no consequences for its own role in this clear ethics violation. That does not at all excuse Michael's conduct, but it is worth remarking that he is the only person being held accountable for this conflict of interest.

Company A paid Michael a total of $96,336 between September 2019 and July 2020 for his work.[4] PSR ¶ 7-24. While neither the government nor Company A was harmed by his outside work, this is exactly the scenario § 208(a) is designed to prevent, and Michael knew he should not have engaged in it.

---

[3]    The oil and gas industry—where clear communications across massive oil fields and on remote deep-water drilling rigs are crucially important—is a major consumer of communications services. *See* McKinsey & Co., "How tapping connectivity in oil and gas can fuel higher performance,"    https://www.mckinsey.com/industries/oil-and-gas/our-insights/how-tapping-connectivity-in-oil-and-gas-can-fuel-higher-performance (last accessed April 30, 2025).

[4]    Not all of that was profit to Mr. Henry. The figure includes reimbursements for travel and other expenses he paid.

A separate contractor, Company B, reported Michael's consultancy to his command in February 2020, after it learned of his outside work for Company A. PSR ¶¶ 7-38–41. He then stopped work for Company A and was told to cease outside business activities. PSR ¶¶ 7-42–43. Under the same prior outside work authorization, Henry had also provided consulting services to a different outfit, Company C, for several months during 2020. As the government correctly notes, PSR ¶ 7-44, he continued to provide consulting services to Company C for approximately another year, although those services did not involve the same kind of improper overlap as his work for Company A.

The government also takes issue with Michael's interactions with Company A as he prepared to retire. This goes too far, and it is unnecessary in light of his acknowledgment of wrongdoing with respect to the 2019–2020 Company A consultancy. As the government concedes, while Michael was preparing to retire, he wrote to his command to inform them that he intended to negotiate employment with Company A. He explicitly asked to be recused from any work involving Company A, and was *given approval* to negotiate post-government employment with Company A. PSR ¶ 11.

Then, after explicitly approving Michael's request to seek outside employment with Company A—and having received his request for official recusal—members of the command failed to ensure Michael was not included on some communications involving Company A.[5] Continuing to blame Michael for communications he specifically asked his command to block is

---

[5]    That was not the first time the command seemed not to understand the applicable ethics rules and how to comply with them. In the aftermath of the Company A incident, command counsel issued two hopelessly confusing ethics opinions, neither of which concluded that Michael's work for Company A involved a clear conflict.

a bridge too far. Michael has acknowledged his violation of § 208(a). There is no need to pile on attenuated conflict allegations that should be remedied at the command level.

**B. The History and Characteristics of the Defendant**

      1.   <u>Military service and health</u>

Time and again, over a period of decades, Michael answered the call when his country asked for his service. Born in Puerto Rico, he grew up all around the country in a warm, close, and supportive military family. PSR ¶ 33. His father served in the U.S. Marines and then as an FBI agent. PSR ¶ 34. As his mother explains, Michael's "dream was to serve his country with valor and honor as his father and grandfathers did." Ex. A at 1. He graduated in 1998 from UC Davis, where he was a member of ROTC, and immediately pursued that dream by commissioning in the Army and beginning what turned out to be a 30-year military career. He first deployed to Iraq during the Persian Gulf War with the 101st Airborne Division, where he took part in dozens of ground combat missions. PSR ¶ 54. After completing Ranger School, he spent four years with the 82nd Airborne Division as a Signal Officer, then joined the Cyber Division of the U.S. Joint Forces Command before entering the reserves. *Id.*

After the 9/11 terrorist attacks, Michael was reactivated, received additional training, and served with a Ranger Battalion and later as part of Delta Force for the next 17 years. PSR ¶¶ 54, 56. He was deployed to Iraq or Afghanistan repeatedly, from 2005–2006, 2006–2007, 2007–2008, in 2009 and 2010, and then finally in 2012–2013. PSR ¶ 55. Some of the particulars of the special forces work he did remain classified. But at a high level of generality, during those deployments he took direct part in or provided signals support for thousands of targeted air and ground raids against Al Qaida and Taliban fighters, including on nighttime helicopter air assaults and in close

combat. PSR ¶ 55. He also took part in approximately 16 hostage rescue missions. PSR ¶ 56. Michael, who had combat medical training, regularly provided battlefield medical assistance to the wounded and dying. *Id.* He saw death and destruction up close because he was there, in the midst of it. After returning home for approximately six months after each half-year deployment, he was asked to do it again, and he did, repeatedly.

Those experiences took their toll. Over the course of his deployments, Michael survived over 20 close-proximity IED explosions. PSR ¶ 55. He still finds shrapnel surfacing on his skin. PSR ¶ 39. More seriously, he has been diagnosed with traumatic brain injury as a result. Unsurprisingly, given what he witnessed, he has also been diagnosed with PTSD, among other disabling conditions. PSR ¶¶ 39–40.[6] As his father described in his letter to Your Honor, "[t]hese wounds, while not immediately visible, are very real, incurable and progressively degenerative. They impact his life on a daily basis. I have already noticed indications of short term memory issues, high levels of stress and abnormal sleep patterns," which his father believes "impact[] his decision making processes." Ex. A at 3.

From the outside, though, Michael was successful at what he did. His commanding officers raved about his work, describing him as an "absolute superstar," "truly outstanding," and "top 1% of Army signal officers." *See* Ex. B at 5, 7. As one commanding officer put it: "LTC Henry is one of the most tactically proficient officers in the command. I only assign the most difficult tasks to him; he consistently delivers results." *Id.* at 3. Among his many campaign, combat, and other decorations are five Bronze Star awards.[7] Michael retired in 2018 as a full Colonel. PSR ¶ 52.

---

[6]     PSR ¶ 39 includes a more detailed listing of Mr. Henry's service-related disabilities.

[7]     The full list of his dozens of commendations is at PSR ¶ 52.

2.     <u>Personal and family life</u>

Throughout all of that, Michael was balancing his role as husband and as father to three children after the tragic loss of his first son. PSR ¶ 35. Unfortunately, after almost thirty years of marriage, the stress that his work put on his relationship finally overwhelmed it. *Id.* He and his wife divorced in August 2018, and he began making regular alimony payments. He formed his consulting company three months later, and six months after that signed the consultancy agreement with Company A at issue here. PSR ¶¶ 7-5, 7-17. While it is not an excuse for his poor decision making, the temporal proximity between the crime of conviction and both his divorce and retirement from active military service—both well-known stressors—should not be ignored. Those stressors, combined with the significant effects of his service-related injuries, certainly played a role in the marked decline in Michael's judgment and decision-making that began in 2019.

Even so, despite the many challenges he has faced, Michael has been a bright light in the lives of his family, friends, fellow veterans, and Bible study compatriots. A review of their letters to Your Honor, from people who have known him from every facet and period of his life, paint a picture of a caring, considerate, dedicated family man immensely unlikely to re-offend. Ex. A. Any term of incarceration would be devastating, not so much for Michael as for his family. In addition to taking care of his elderly parents, who moved to his neighborhood in Virginia Beach so that he could help them as they got older,[8] he also provides assistance to his sister—who did the same thing—and is a role model and father figure to her son, whose condition is described in PSR ¶ 36. He also provides financial support to his elderly aunt in Puerto Rico and the nuns who care for her. *Id.*; Ex. A at 1. He is equally generous with his friends and fellow veterans, providing

---

[8]     *See* Ex. A at pages 1, 4, 5.

counseling and mentorship to those who, like Michael, "have paid a very high price personally for their services." Ex. A at 9, 10, 14.

Michael has no substance abuse history and has worked throughout his life, since he was a boy. Ex. A at 1; PSR ¶¶ 48–52. He has no criminal history of any kind. PSR ¶¶ 26–32. For someone who has lived the kind of life he has—unblemished until now, and devoted to duty and country—the fact of this prosecution and conviction is alone a significant punishment. Michael is embarrassed at what he has put his family through and in no danger of re-offending. In addition to a felony conviction and the loss of rights it entails, Michael learned last week that the Government Services Administration has instituted debarment proceedings against him personally and against his consulting company as a result of this case. His ability to find contract work in the communications industry was already hit hard by this prosecution. Debarment from federal contracts—which can affect a sole proprietor's ability to work as a subcontractor in the communications field, even if he does not contract directly with the government—will almost certainly drive Michael's earning ability down even further. This case, and the cost and expense of its follow-on effects, are already a significant financial punishment. All of those facts weigh heavily against a dramatic fine request for more than 25 times the top end of the guidelines range, for an offense for which which other federal courts typically levy significantly lower fines, if any.

### C.    Section 3553(a)(2) Factors

Section 3553(a)(2) requires the Court to consider the need for the sentence imposed "(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public

from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner."

Each of those factors favors a sentence to a short probationary term and, if the Court finds it appropriate, a reasonable fine.

Subparts (C) and (D) are easily dealt with. Michael does not present any danger to the public and never has. In the context of this case, he has successfully met all pre-trial supervison requirements, and has been trusted to travel out of state for work when necessary.[9] As to (D), Michael has earned both Bachelor's and Master's degrees, and he has ready access to medical treatment through the VA and other sources. He does not need vocational or other training.

Turning to deterrence, this conviction alone provides more than adequate deterrence of any future criminal conduct. A terrible decision he made in 2019 has derailed Michael's life during what should be the closing decade of his working career. That is already a significant punishment. He is in no danger of committing any further offense, and a sentence to probation rather than incarceration does not alter that analysis.

A sentence of probation and/or a reasonable fine are also more than sufficient to reflect the seriousness of this offense, promote respect for the law, and provide just punishment. Mr. Henry's absolutely clean record before and after this offense, and his decades of service as a decorated Army officer, are strong evidence of his respect for the law. He knows he made a mistake and that what he did was wrong, and he is remorseful, especially for the effect his actions have had on his

---

[9]    Michael requests that any period of probation allow unrestricted travel to the continental United States and Puerto Rico, to allow him to continue in his career, and allow international travel for work with Probation Officer approval. Michael's current consulting work includes indirect assistance to the Ukrainian armed forces. It is in the nation's interest that he be allowed to continue that work.

immediate family. And while § 208(a) plays an important role in setting the norms and standards meant to prevent the possibility of bribery and graft, there is no suggestion that Michael committed those more serious offenses, engaged in any kind of fraud, or harmed anyone (including the government). The offense is serious because any federal offense is serious, but Michael's violation of the statute is not in the same category as the fraud, bribery, and corruption cases this Court handles. A sentence of probation and a reasonable fine, if the Court decides to assess one, provide just punishment under the circumstances of this case. Anything more would be greater than necessary.

### D.    The Need to Avoid Unwarranted Sentencing Disparities

The need to avoid unwarranted sentencing disparities, under 18 U.S.C. § 3553(a)(6), also favors a probationary sentence and a guidelines range fine. The U.S. Office of Government Ethics publishes an annual Conflict of Interest Prosecution Survey that describes § 208(a) prosecutions across the country, along with conflict of interest prosecutions under other federal statutes.[10] The annual surveys contain a trove of useful comparators. The most recent surveys, from 2022 and 2023, describe the following § 208(a) cases among others:

- *U.S. v. Drey*, No. 3:23-cr-17 (N.D. Fla.): Federal prosecutor who steered EOUSA contracts to her spouse's company sentenced to six months' probation and $500 fine.

- *U.S. v. Spann*, No. 1:23-cr-111 (D.D.C.): OPM contract officer steered contract to her husband's company and served as primary contract specialist on the awarded contract, under which over $25 million of work was performed; she also awarded a second contract to a separate company for which her husband wrote the proposal. She received 24 months' probation and a $10,000 fine.

---

[10]    *See* https://www.oge.gov/web/oge.nsf/Resources/Conflict+of+Interest+Prosecution +Surveys+(by+Year) (last accessed April 30, 2025).

13

- *U.S. v. Kuciapinski et al.*, No. 1:18-cr-429 (D. Colo.): Active duty Air Force Major who worked at the National Reconnaissance Office conspired with an NSA employee to obtain a government contract for the benefit of his wife. A 49-count superseding indictment charged the defendant and co-conspirators with, in addition to violating § 208(a), procurement fraud, false statements, 30 counts of wire fraud, and major fraud against the United States under § 1031. One co-conspirator pleaded guilty to a § 371 charge and received five years of probation and a $1,000 fine. The lead defendant was dismissed for a Speedy Trial Act violation.

- *U.S. v. Tribble et al.*, No. 19-541 (D. Puerto Rico): FEMA fraud case in which a FEMA official evaluated the company she was preparing to work for as part of a vendor bid process on $1.8mm contract. She was charged with violating § 208(a) and with multiple counts of wire fraud, pleaded guilty, and was sentenced to three years of probation (no fine).

- *U.S. v. Gomez*, No. 1:22-cr-7 (N.D. Fla.): Postmaster who helped award contracts to her spouse and mother was sentenced to one year of probation (no fine).

- *U.S. v. Tolson*, No. 1:21-cr-446 (D.D.C.): Park Police officer worked part time for a helicopter maintenance company while communicating with the company about its federal work in his role as a federal employee. He was sentenced to 24 months of probation and a $1,000 fine.

Mr. Henry's case is less serious, monetarily and otherwise, than most of the matters outlined above. In several of those cases, multiple *fraud* charges were resolved with a probationary sentence paired with a low fine, or none at all. There are other similar examples in prior OGE Conflict of Interest Prosecution Surveys, which date back to 1990. Reviewing them makes clear that it would be unusual for someone convicted under these facts to receive anything other than a probationary sentence and a guidelines range fine as punishment, if they are fined at all.

## **CONCLUSION**

For all of these reasons, Mr. Henry asks the Court to sentence him to a period of probation.

Respectfully Submitted,

Michael Henry

By:        /s/ Andrew Bosse_____

Andrew Bosse, VSB No. 98616
Baughman Kroup Bosse PLLC
500 East Main Street, Suite 1400
Norfolk, Virginia 23510
(757) 961-5771
abosse@bkbfirm.com

Dane C. Ball, *pro hac vice*
Richard D. Houghton, *pro hac vice*
Murphy Ball Stratton LLP
1001 Fannin St., Ste. 720
Houston, Texas 77002
(713) 299-2282
dball@mbssmartlaw.com
rhoughton@mbssmartlaw.com

*Attorneys for Michael Henry*

## CERTIFICATE OF SERVICE

I hereby certify that this 1st day of May 2025, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which sent notification of such filing to all counsel.

By: ____/s/ Andrew Bosse_____
Andrew Bosse, VSB No. 98616
Baughman Kroup Bosse PLLC
500 East Main Street, Suite 1400
Norfolk, Virginia 23510
(757) 961-5771
abosse@bkbfirm.com